**EPICREALM LICENSING, LP, et al.  Plaintiffs,**

v.

**FRANKLIN COVEY CO., et al., Defendants.**

Civil Action No. 5:07–CV–126.

United States District Court, E.D. Texas, Texarkana Division.

Nov. 17, 2008.

 

Larry Dean Carlson, Brian James Gaffney, Jennifer Paige Adams, Kevin James Meek, Ryan Lee Bangert, Baker Botts, Terry Fokas, EpicRealm Licensing, LP, Dallas, TX, Andrew Wesley Spangler, Spangler Law PC, Thomas John Ward, Jr., Ward & Smith Law Firm, Elizabeth L. Derieux, Sidney Calvin Capshaw, III, Capshaw Derieux, LLP, Longview, TX, Benjamin J. Bradford, David R. Bennett, Emily C. Johnson, George S. Bosy, Harry J. Roper, Patrick L. Patras, Paul D. Margolis, Scott A. Spencer, Jenner & Block LLP, Chicago, IL, Deborah J. Race, Otis W. Carroll, Jr., Ireland Carroll & Kelley, Tyler, TX, Franklin Jones, Jr., Jones & Jones, Marshall, TX, for Plaintiffs.

Kenneth Robert Adamo, Jones Day, Dallas, TX, A. Gregory Gibbs, Ostrolenk Faber Gerb & Soffen, Andrey Belenky, Barry R. Satine, Ognjan V. Shentov, Stela Cristina Tipi, Jones Day, New York, NY, Alain Villeneuve, Brian W. Ledebuhr, David L. Doyle, Jeanah Park, Jeremy Heuer, Robert S. Beiser, Robert S. Rigg, Stanley B. Block, William Renick Gaines, II, William J. Voller, III, Vedder Price, PC, Ludwig E. Kolman, Pope Cahill & Devine Ltd., Chicago, IL, Charles Ainsworth, Tyler, TX, William J. Brown, Jr., Jones Day, Irvine, CA, Tyler Alexander Baker, Todd Richard Gregorian, Virginia K. Demarchi, Fenwick & West, Mountain Valley, CA, Bryan Alexander Kohm, Michael J. Sacksteder, Fenwick & West, San Francisco, CA, Ira P. Rothken, Rothken Law Firm, San Rafael, CA, Matthew Richard Rodgers, Danny Lloyd Williams, Williams Morgan & Amerson PC, Houston, TX, J. Stephen Ravel, Jonathan M. Buck, Kelly Hart & Hallman, Joseph Roger Williams, Jr., Andrews Kurth LLP, Austin, TX, Otto O. Lee, Intellectual Property Law Group, San Jose, CA, for Defendants.

## ORDER

DAVID FOLSOM, District Judge.

The above-entitled and numbered civil action was referred to United States Magistrate Judge Caroline M. Craven pursuant to 28 U.S.C. § 636. Dkt. No. 75. The Report of the Magistrate Judge, which contains her proposed findings of fact and recommendations for the disposition of such action, has been presented for consideration. Dkt. No. 563. Plaintiffs epicRealm Licensing, LP and Parallel Network, LLC filed objections to the Report and Recommendation of the Magistrate Judge. Dkt. No. 603. The Court conducted a *de novo* review.

## BACKGROUND

[E]picRealm Licensing, LP and Parallel Networks, LLC (collectively "Plaintiffs" or "epicRealm") have sued Herbalife International of America, Inc. ("Defendant" or "Herbalife") and other unrelated companies (collectively "Defendants"), alleging Defendants are infringing United States Patent Nos. 5,894,554 ("the '554 patent") and 6,415,335 ("the '335 patent") (collectively "the Patents"). The Patents allegedly encompass certain systems and methods to dynamically generate web pages. Plaintiffs' Patents purport to cover a process in which a web server interacts with a page server and other data sources to generate dynamic web pages that are subsequently transmitted over the Internet.

Herbalife moves for partial summary judgement of noninfringement, asserting

that the accused websites were not operated by Herbalife from September 2003 to April 2007. Dkt. No. 437. Herbalife contends that those websites were operated by an independent hosting company, QuinStreet, Inc. ("QuinStreet"). *Id.*

## REPORT AND RECOMMENDATION

In her Report and Recommendation dated July 15, 2008, the Magistrate Judge recommended that Herbalife's Motion for Partial Summary Judgment of Noninfringement be granted. Dkt. No. 563. Specifically, the Magistrate Judge found no genuine issues of material fact regarding whether Herbalife was a "user" under the Federal Circuit's opinion in *NTP, Inc. v. Research in Motion, Ltd.,* 418 F.3d 1282 (Fed.Cir.2005), or this Court's opinion in *epicRealm Licensing, LLC v. Autoflex Leasing, Inc., et al.,* 492 F.Supp.2d 608 (E.D.Tex.2007). *Id.* at 818–21. Therefore, the Magistrate Judge concluded that Herbalife could not be liable for direct infringement as a matter of law for the time period in question. *Id.*

The Magistrate Judge also found that Plaintiffs had failed to provide evidence that raised a genuine issue of material fact as to whether Herbalife controlled some part of the accused system. *Id.* at 821. Accordingly, the Magistrate Judge concluded that Herbalife could not be liable under a theory of joint infringement. *Id.* Finally, the Magistrate Judge found no genuine issue of material fact regarding whether Herbalife was liable under a theory of indirect or induced infringement because, under *epicRealm,* Herbalife's distributors or website visitors were not "using" the accused system. *Id.* at 823–24.

## PLAINTIFFS' OBJECTIONS

Plaintiffs filed objections to the Magistrate Judge's recommendation that Herbalife's Motion for Partial Summary Judgment of Noninfringement be granted.

Dkt. No. 603. Specifically, Plaintiffs raise the following three primary objections to the Magistrate Judge's Report and Recommendation. First, Plaintiffs assert that the Magistrate Judge's direct infringement analysis improperly relied on this Court's decision in *epicRealm,* a decision that "diverged" from the teachings of *NTP* and its progeny. To support this assertion, Plaintiffs point to three cases that interpret the Federal Circuit's holding in *NTP: Civix–DDI, LLC v. Cellco Partnership,* 387 F.Supp.2d 869 (N.D.Ill.2005), *RealSource, Inc. v. Best Buy Co.,* 514 F.Supp.2d 951 (W.D.Tex.2007), and *Renhcol Inc. v. Don Best Sports,* 548 F.Supp.2d 356 (E.D.Tex. 2008). *Id.* at 5–8. In the alternative, the Plaintiffs would have this Court disregard its former holding in *epicRealm,* if this Court determines that it had previously erred in that case. *Id.* at 8 n.5.

Second, Plaintiffs contend the Magistrate Judge incorrectly found no fact issue with respect to Herbalife's inducement of its distributors to use the accused system. *Id.* at 10–11. According to Plaintiffs, their summary judgment evidence demonstrated that Herbalife actively encouraged its distributors to use the Herbalife website after it had learned that QuinStreet was using an infringing system. *Id.*

Third, Plaintiffs assert that the Magistrate Judge erred in finding no genuine issue of material fact regarding joint infringement because the evidence suggested that Herbalife had a contractual relationship with and provided instructions to QuinStreet that facilitated infringement. *Id.* at 11–14.

## *DE NOVO* REVIEW

At the outset, the Court finds that its prior decision in *epicRealm* was correctly decided and was not clearly erroneous or contrary to law. Indeed, one case that Plaintiffs cite to support their objections

examined *epicRealm* at length and did not consider it contrary to Circuit precedent. Instead, that case relied heavily on this Court's opinion in *epicRealm* and found that it, in conjunction with *NTP*, "requires courts to determine which party exercises control and derived beneficial use of the allegedly infringing aspects of the accused system." *Renhcol*, 548 F.Supp.2d at 363. The court in *Renhcol*, however, found its facts to be distinguishable from the facts set out in *epicRealm*. *Id.* Conversely, the Plaintiffs here have provided no compelling reason why their current case against Herbalife should be distinguished from the facts surrounding the *epicRealm* decision. Therefore, this Court applies the rule it set out in *epicRealm* to the present matter.

■ This Court finds no factual distinction between the Herbalife and Macerich, the Defendant in *epicRealm*. Herbalife is not a "user" of the accused software, which is operated by third-party QuinStreet. Additionally, Herbalife's users and distributors are not "using" the accused software. Finally, because it is not a "user" of the accused system, Herbalife cannot be said to control the conduct the accused system. In addition, there is insufficient evidence to suggest that Herbalife controlled the conduct of QuinStreet. As such, Herbalife cannot be liable for either direct, indirect, or joint infringement during the time period in question.

Plaintiff's objections are thus without merit. The Court is of the opinion that the findings and conclusions of the Magistrate Judge are correct. Therefore, the Court hereby adopts the Report of the United States Magistrate Judge as the findings and conclusions of this Court. Accordingly, it is hereby **ORDERED** that Herbalife's Motion For Summary Judgment of Noninfringement (Dkt. No. 437) is **GRANTED**.

EPICREALM LICENSING, LP, et al.

v

AUTOFLEX LEASING, INC., et al.

No. 5:07CV125

EPICREALM LICENSING, LP, et al.

v

FRANKLIN COVEY CO., et al.

No. 5:07CV126

EPICREALM LICENSING, LP, et al.

v

VARIOUS, INC.

No. 5:07CV135

## REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE

CAROLINE M. CRAVEN, United States Magistrate Judge.

Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3) and the Amended Order for the Adoption of Local Rules for Assignment of Duties to United States Magistrate Judges, Defendant Herbalife International of America's Motion for Partial Summary Judgment of Non–Infringement (Docket Entry # s 479, 437, 105) was referred to the undersigned for the purpose of issuing a report and recommendation. The Court, having reviewed the relevant briefing and hearing arguments of counsel June 24, 2008, recommends Herbalife's motion be **GRANTED**.

## I. FACTUAL BACKGROUND

[E]picRealm Licensing, LP and Parallel Networks, LLC ("Plaintiff" or "epicRealm") have sued Herbalife International of America, Inc. ("Defendant" or "Herbalife") and other unrelated companies (collectively "Defendants"), alleging Defendants are infringing United States Patent Nos. 5,894,554 (the "'554 patent") and 6,415,335 (the "'335 patent") (collectively the "Patents"). Plaintiff's Patents purport to cover a process in which a web server

interacts with a page server and other data sources to generate dynamic web pages that are subsequently transmitted over the Internet. In the present lawsuit, epicRealm has accused Herbalife of infringing both method and system claims of the '554 and '335 Patents.

## II. HERBALIFE'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Herbalife moves for partial summary judgment of noninfringement, asserting the websites presently accused by Plaintiff of infringing the Patents were not operated or controlled by Herbalife during the relevant time period. According to Herbalife, from about September 2003 to about April 2007, the websites accused in this case were owned, selected, controlled, and operated exclusively by an independent hosting company, QuinStreet, Inc. ("QuinStreet"). Herbalife's Motion for Partial Summary Judgment pertains only to the time period from 2003 until April 2007 and does not affect epicRealm's claims against Herbalife for infringement taking place after April 2007.

## III. UNDISPUTED MATERIAL FACTS

### A. The Lawsuit

The epicRealm Patents are directed to methods and apparatus for managing dynamic web page generation requests on custom websites. Websites exist on computer servers programmed to accept and respond to requests received from users of the World Wide Web. In the vernacular of the Patents, this functionality is supplied by a method in which a web server is connected to and interacts with page server software to generate dynamic web content. [E]picRealm has filed several lawsuits against Herbalife and other unrelated defendants based on the same patents in suit here. [E]picRealm has accused Her-

balife of infringing both of the epicRealm patents under 35 U.S.C. § 271(a) and (b). [E]picRealm has withdrawn its claim against Herbalife under § 271(c).

### B. Background of the Patented Technology

The Web refers to all of the content stored on web servers and other computers that is accessible via the Internet. ('554 patent, 1:14–17, Ex. 2). This content exists or is retrieved in the form of web pages that form websites, stored on web servers and related data sources. (*Id.* at 1:23–24.) A website may store numerous web pages, each accessible by a unique address known as a Uniform Resource Locator ("URL"). (*Id.* at 1:24–38). Typically, Internet users access the Web using web browsers, such as Internet Explorer, that run on their computers (called "web clients" or simply "clients"). (*Id.*). A user can access a particular web page by entering the appropriate URL in his web browser. (*Id.*).

According to epicRealm, its patents claim a method in which the page server software processes requests for dynamic web pages and releases the web server to concurrently handle other incoming requests. Claim 1 of the '554 patent exemplifies the claimed methods. It claims:

A computer-implemented method for managing a dynamic Web page generation request to a Web server, said computer-implemented method comprising the steps of:

routing said request from said Web server to a page server, said page server receiving said request and releasing said Web server to process other requests, wherein said routing step further includes the steps of intercepting said request at said Web server, routing said request from said Web server to a dis-

patcher, and dispatching said request to said page server;

processing said request, said processing being performed by said page server while said Web server concurrently processes said other requests; and dynamically generating a Web page in response to said request, said Web page including data dynamically retrieved from one or more data sources.

The apparatus claims of the epicRealm patents are similarly directed to computer systems and software that accomplish the claimed methods. (*See* '554 patent at 9–11, Ex. 2).

## IV. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the movant is able to demonstrate that the pleadings, affidavits and other evidence available to the Court establish that there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(C). The movant bears the responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Topalian v. Ehrman*, 954 F.2d 1125 (5th Cir.1992), *cert. denied*, 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992).

The nonmovant is not required to respond to a motion for summary judgment until the movant first meets its burden of demonstrating that there are no factual issues warranting trial. *Ashe v. Corley*, 992 F.2d 540 (5th Cir.1993). Once the movant has shown the absence of material fact issues, however, the opposing party has a duty to respond, via affidavits or other means, asserting specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e). It is not enough for the party opposing summary judgment to rest on mere conclusory allegations or denials in his pleadings. *Topalian*, 954 F.2d at 1131. The nonmovant must point out, with factual specificity, evidence demonstrating the existence of a genuine issue of material fact on every component of the nonmovant's case. *Dunn v. State Farm Fire & Casualty Co.*, 927 F.2d 869, 872 (5th Cir.1991). If the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2551, 91 L.Ed.2d 265 (1986). In assessing the proof, the court views the evidence in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The Court's responsibility is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The inquiry is "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505; *see also Cooper v. Ford Motor Co.*, 748 F.2d 677, 679 (Fed.Cir.1984); *see also SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1116 (Fed.Cir.1985) (*en banc*) ("[T]he district court must view the evidence in a light most favorable to the nonmovant and draw all reasonable inferences in its favor, ... and must resolve all doubt over factual issues in favor of the party opposing summary judgment."); *Hibernia Nat'l. Bank v. Carner*, 997 F.2d 94,

97 (5th Cir.1993). The Federal Circuit has held that "summary judgment is as appropriate in a patent case as in any other." *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 835 (Fed.Cir.1984); *see also Meyers v. Brooks Shoe, Inc.*, 912 F.2d 1459, 1461 (Fed.Cir. 1990) (summary judgment is appropriate in patent cases).

## V. SUMMARY JUDGMENT EVIDENCE

### A. Herbalife's Evidence

Herbalife's summary judgment evidence reveals as follows. Herbalife's core business is distributing and selling weight management, nutrition and skin care products, as well as related services. These products and services are sold to distributors who resell the products to consumers in sixty-five (65) countries worldwide. (Adams Dec. ¶ 3).

Internet users can learn about Herbalife and its products through its website, *www. herbalife.com*, or by following links provided at *www.herbalife.com* to other web pages. (Adams Dec. ¶ 4). Distributors could make purchases through *www. myherbalife.com* as well as by other non-Internet methods. (Adams Dec. ¶ 5). The accused website(s), however, were not hosted on servers belonging to Herbalife. (Adams Dec. ¶¶ 6–9) (Harris Dec. ¶¶ 6–7). Herbalife did not own, operate, control, or maintain the servers hosting these websites. (Adams Dec. ¶ 9) (Harris Dec. ¶¶ 6–7). Rather, Herbalife purchased web hosting services from QuinStreet, an independent, third-party service provider. (Adams Dec. ¶ 6–7) (Harris Dec. ¶ 4).

QuinStreet is an independent, privately-owned company unrelated to Herbalife. QuinStreet offers a variety of hosted, Internet-based business services to web-enabled companies with networks of direct sales persons and independent distributors. (Harris Dec. ¶ 3). In February 2003, QuinStreet entered into an agreement with Herbalife under which QuinStreet provided hosting and a variety of other services for Herbalife websites, including, among other things, technical design and development, order management, and lead generation management. QuinStreet hosted Herbalife's websites using hardware and software that was owned and controlled by QuinStreet and which was located in QuinStreet's facilities. (Harris Dec. ¶ 6). QuinStreet configured the computer systems and made the Herbalife web pages available on the Internet. (Harris Dec. ¶ 7). Consequently, Herbalife had no involvement in selecting and configuring the website servers, software programs or related apparatus. (Adams Dec. ¶ 8) (Harris Dec. ¶¶ 4, 7).

Until this suit was filed, Herbalife knew very little about the software systems being used to host its web pages. Herbalife did not know how that software or related servers were operated or configured. (Adams Dec. ¶ 12). Herbalife did not specify, and was not involved in choosing, the particular systems or methods by which the hosting would be accomplished. (Harris Dec. ¶¶ 4, 6–7) (Adams Dec. ¶¶ 8–9).

QuinStreet, not Herbalife, independently selected, configured, owned, licensed, operated, and controlled the accepted equipment and software programs—including the Apache, mod_wl and Weblogic components—used to host the operations of *www.herbalife.com*, and the other websites hosted by QuinStreet. (Adams Dec. ¶¶ 8–10) (Harris Dec. ¶¶ 4, 6–7). Herbalife did not request or encourage the use of any specific systems, and in particular, did not request or control the use, selection or configuration of the software components accused by epicRealm in its patents. (*Id.*). Finally, Herbalife was unaware of the pat-

ents-in-suit until served with the Complaint in August 2005. (Adams Dec. ¶ 13).

QuinStreet's services and the QuinStreet Agreements terminated as of June 30, 2007. Hosting of the various Herbalife websites was transitioned to Herbalife at various dates in 2007. (Adams Dec. ¶¶ 6–7).

## B. Plaintiff's Evidence

Plaintiff's summary judgment evidence demonstrates as follows. Herbalife is a multinational enterprise that sells primarily weight-loss and health oriented products. (Darcy Dep. at 22). Herbalife relies on an extensive network of 1.7 million "distributors" to promote its products in 65 countries. (Ellis Dep. at 27). Each distributor purchases products from Herbalife directly and then either consumes the purchased products or re-sells them to other persons in the distributor's "downline." (Ellis Dep. at 80–81) (Darcy Dep. at 51). Substantially all of Herbalife's sales are made to its distributors. (Ellis Dep. at 67–68) (Darcy Dep. at 51).

In 2003, Herbalife engaged in a "strategic initiative to significantly upgrade [its] technology infrastructure throughout the world." (Ellis Dep. at 32, Ex. 3 at 8 (Herbalife FY2007 Form 10–K)). On February 6, 2003, Herbalife entered into a contract with QuinStreet called the "QuinStreet Agreement" to receive hosting and other services in connection with some of Herbalife's websites, including but not limited to *www.herbalife.com* ("Herbalife.com") and *www.myherbalife.com* ("MyHerbalife.com") (collectively, the "websites"). (Adams Dep. at 54, Ex. 2 (QuinStreet Agreement)) (Harris Dep. at 53) (Taurek Dep. at 196). The Agreement expressly provided Herbalife, "its Affiliates and Distributors the *right and license* throughout the Term [of the Agreement] to *use* the [QuinStreet] Platform." (Adams Dep. at 54, Ex. 2 at 3)

(emphasis added) (Adams Dep. at 35). The QuinStreet Platform comprised QuinStreet's "software, equipment, services and other resources" which were used by Herbalife to host Herbalife.com and My-Herbalife.com. (Adams Dep. at 54, Ex. 2 at 1) (Harris Dep. at 58).

The QuinStreet Agreement required QuinStreet to integrate its Platform with Herbalife's computer system—an effort that was estimated to take "175 person days of QuinStreet's time." (Adams Dep. at 54, Ex. 2 at 7). QuinStreet was also required to provide "Network Services" to Herbalife, which consisted of networking QuinStreet's Platform and Herbalife's system together using a virtual private network or "VPN" link. (Harris Dep. at 77) (Adams Dep. at 54, Ex. 2 at 7–8) ("Network Services include: ... Client Side Remote VPN, Client Side VPN Tunnel ..."). Herbalife personnel communicated on a weekly basis with QuinStreet project managers during the "development phase" of the Herbalife websites to ensure an understanding of the "business requirements." (Harris Dep. at 65–66).

For instance, Herbalife provided QuinStreet their "documentation" for their standard format for transferring data, also called simple object access protocol ("SOAP"). (Harris Dep. at 82–83). QuinStreet, in turn, "wrote code and extensions to [its] internal Java platform to meet the specific business requirements of Herbalife." (Harris Dep. at 53).

According to Plaintiff, the integration of QuinStreet's Platform with Herbalife's Web Services Tier facilitated communication and interoperation between the two systems. For instance, QuinStreet maintained an administrative interface and a public interface through which Herbalife personnel and Herbalife distributors could place information into the QuinStreet database. (Harris Dep. at 77–78). Using the

administrative interface, Herbalife could electronically transmit content to Quin-Street for display on Herbalife's public-facing websites. (Harris Dep. at 53–55). "The information would have mostly come from Herbalife," but some QuinStreet "in-house people" could also have been writing content on Herbalife's behalf. (*Id.* at 54). QuinStreet had content writers and editors in-house. (*Id.*). QuinStreet also had its own "design people in-house." (*Id.* at 57). Like all of QuinStreet's clients, Herbalife was given the opportunity to review the design and the branding of its websites. (*Id.* at 57–58)

The network connection, specifically a VPN tunnel (Adams Dep., Ex. 2 at 7–8), which linked Herbalife's system to Quin-Street's Platform allowed QuinStreet to pull information from Herbalife's database each time a distributor logged into the QuinStreet system after either logging off or timing out from a previous session. (Harris Dep. at 81) (Adams Dep. at 73) (*see also* Taurek Dep. at 199–202) (calling the Web services "box" a "data source, a generalized place for applications to get data"). After either a time-out function or a log out by a distributor, the next time the distributor logged into MyHerbal-ife.com, the distributor information would have to be pulled again from Herbalife's database. (Harris Dep. at 79–81) (Adams Dep. at 35) (Taurek Dep. at 200–02) ("Some distributor information was provid-ed each time a distributor would log in.").

In addition, Herbalife supplied informa-tion to QuinStreet at fifteen minute inter-vals regarding the inventory levels and status of products available for purchase on MyHerbalife.com. (Adams Dep. at 48–54) (Taurek Dep. at 199–200). Quin-Street's corporate representative, Craig Harris, confirmed that QuinStreet pulled data from Herbalife's system via the VPN link on a daily basis:

Q. Are you aware of any instances where information was pulled from an Herbalife database into the Quinstreet system?
A. Product information, pricing infor-mation and information about distribu-tors.
Q. How often was that pulled?
A. Product and pricing, I believe, was on a timed basis. I don't have the spe-cific details. I would expected (sic) it to be, you know, daily or some kind of frequency that would have—could have changed and been configurable, and the distributor information was pulled at the point where a distributor logged into the system.

(Harris Dep. at 79–80).

After the initial development of the Her-balife websites and the linking of Quin-Street's Platform to Herbalife's system, Herbalife communicated with QuinStreet about its websites on nearly a "daily ba-sis." (Adams Dep. at 56–57). In the be-ginning, "there was a lot of interaction very regularly. And then eventually, after we were in production and using the sys-tem, probably less frequently but still fair-ly regularly." (*Id.* at 57). Following the development phase, Herbalife and Quin-street held weekly telephone conferences to discuss such things as website "en-hancements," "ongoing development," "support and maintenance," and "future business requirements" for the Herbalife websites. (Harris Dep. at 68–69). In ad-dition, QuinStreet regularly notified Her-balife about performance issues with the websites, and worked with Herbalife to "troubleshoot" performance issues. (Har-ris Dep. at 71–73) (Taurek Dep. at 198). Herbalife had the right to control the "look and feel of the information" displayed on the QuinStreet hosted websites, as well as the "branding" and the colors and "things like that." (Adams Dep. at 48–50).

Plaintiff asserts the evidence shows Herbalife likewise maintained direct control over its websites. Specifically, Herbalife had four ways in which it could deny (or allow) web patrons access to its websites. First, Herbalife supported the authentication process used by distributors to log in to MyHerbalife.com. (Adams Dep. at 67). Second, Herbalife presently owns the URLs Herbalife.com and MyHerbalife.com. (Adams Dep. at 26–31). Third, Herbalife could shut down all access to its websites. For example, Herbalife could redirect its websites away from QuinStreet to an "Site Not Working" page if an "issue" arose. (Adams Dep. at 86–87). Fourth, Herbalife also controlled the dynamic information supplied to QuinStreet and then accessed by distributors. (Adams Dep. at 48–50) (Harris Dep. at 79–81).

Finally, Plaintiff asserts Herbalife has consistently encouraged its distributors to use its websites. The QuinStreet Agreement provides that it is "in the best interests [of Quinstreet and Herbalife] to maximize adoption and retention of the QuinStreet platform among distributors." (Adams Dep. at 54, Ex. 2 at 10). Following execution of the QuinStreet Agreement, Herbalife continued to promote the use of its websites to its distributors when QuinStreet hosted training conference calls with Herbalife distributors in order to educate distributors on how to use the Herbalife websites. (Harris Dep. at 62–63). Herbalife likewise engaged in independent efforts to promote MyHerbalife.com to its distributors, and regularly upgrades MyHerbalife.com in order to provide its distributors with additional online resources. (Ellis Dep. at 65–67) (Harris Dep. at 67–69). Herbalife also holds meetings with distributors to discuss the Herbalife websites. (Ellis Dep. at 31–32). At these meetings, Herbalife discusses with its distributors "the features available on Herbalife's" websites, and encourages its distributors to use Herbalife's websites if such use "fits in with their way of doing business." (Ellis Dep. at 31–32). These meetings are part of Herbalife's policy to make its distributors aware of the Herbalife websites. (Ellis Dep. at 32).

Herbalife has expressed its need to remain competitive to prevent distributors from purchasing products from other multi-level marketing companies. (Ellis Dep. at 85–86). To this end, Herbalife intentionally tracks the use and adoption of its web portal by its distributors. (Ellis Dep. at 124–25). Moreover, Herbalife has stated that increases in internet visits is a positive outcome. (Ellis Dep. at 128) (Adams Dep. at 74).

## VI. DISCUSSION

### A. Plaintiff's claims against Herbalife

Plaintiff is asserting against Herbalife only claims of direct infringement and indirect infringement (inducement to infringe) under 35 U.S.C. § 271(a) and (b). To the extent Plaintiff asserted a claim against Herbalife in its complaint for contributory infringement under 35 U.S.C. § 271(c), Plaintiff moved, at the hearing on Herbalife's motion for summary judgment, to withdraw that claim.

### B. Direct Infringement

#### 1. 35 U.S.C. § 271(a)

■ An alleged infringer directly infringes on a patent if the infringer, without authority, "makes, uses, offers to sell or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent." 35 U.S.C. § 271(a). To show direct patent infringement, the patentee must show someone performed the prohibited acts with a product or process that infringes at least one asserted

claim. *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997) (stating inquiry to determine direct patent infringement is "[d]oes the accused product or process contain elements identical or equivalent to each claimed element of the patented invention?").

### 2. *epicRealm Licensing, LLC v. Autoflex Leasing, Inc., et al.*, 492 F.Supp.2d 608 (E.D.Tex.2007)

Relying heavily on this Court's Order granting The Macerich Company's Motion for Summary Judgment, Herbalife asserts it was QuinStreet and QuinStreet alone who selected, controlled, and executed the methods used to manage dynamic web page requests on the accused Herbalife websites, using hardware and software owned by QuinStreet. As a result, Herbalife asserts it did not make, sell, use, or control the use of the accused system during the QuinStreet hosting period, and therefore it did not infringe the epicRealm Patents as a matter of law during that time.

On June 26, 2007, after a *de novo* review of the undersigned's Report and Recommendation on co-defendant Macerich's motion for summary judgment of noninfringement, Judge Folsom issued a Memorandum Order granting Macerich's motion. In granting Macerich's motion, the Court ruled that "operation is clearly the 'use' that is implicated when dealing with patents directed to 'a method and appara-tus for managing dynamic web page generation requests' and accusations directed to web server computers and software." *epicRealm Licensing, LLC v. Autoflex Leasing, Inc., et al.*, 492 F.Supp.2d 608, 613 (E.D.Tex.2007).

The Court then applied *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282 (Fed.Cir.2005) to determine which party—the website visitors, the website owner that uploaded the website's content onto a third-party's web server, or the web server owner—used the system that allegedly infringed the "method and apparatus for managing dynamic web page generation requests [claims]." *Id.* at 614–15. The court analyzed which party controlled operation of the "software to manage dynamic web page requests" on the accused web server and concluded only the owner of the web server, Red Five, exercised such control. *Id.*

■ Specifically, the Court found Macerich did not specify any part of the Accused Systems or direct their method of operation.[1] Rather, Macerich contracted for the web hosting service, generally, and Red Five independently determined the appropriate and convenient method for providing the service. Macerich was indifferent as to the particular system or method employed. The Court further found that Macerich did not contract out the performance of a conventional step while performing the rest of the claimed process. On the contrary, the Accused Systems

---

1. Liability for direct infringement of a patented process where the steps of the process are performed by separate entities requires "the participation and combined action(s)" of both entities. *On Demand Machine Corp. v. Ingram Industries, Inc.*, 442 F.3d 1331, 1344 (Fed.Cir.2006). Specifically, multiple parties may work together to accomplish the claimed method, *Shields v. Halliburton Co.*, 493 F.Supp. 1376, 1388–9 (1980), or one party may direct the actions of another party, *Free Standing Stuffer v. Holly Development Co.*, 187 U.S.P.Q. 323, 333 (N.D.Ill.1974), or specify the details for performing a unique step, *Marley Mouldings v. Mikron Industries, Inc.*, 66 U.S.P.Q.2d 1701, 1703 (N.D.Ill.2003), or contract out a conventional step while performing the rest of the process, *Metal Film v. Metlon Corp.*, 316 F.Supp. 96, 110 (1970). There is no authority, however, for imposing liability for direct infringement on a party that does not perform any of the steps of the patented method.

were selected, configured, and operated entirely by Red Five.

The Court found, viewing the evidence in the light most favorable to epicRealm, an insufficient connection between Macerich and the web server owner, Red Five, to impose liability for direct infringement on Macerich under *Hill v. Amazon.com, Inc.,* 2006 WL 151911 (E.D.Tex.2006). It was *after* Red Five implemented the web server based on Apache and Tomcat software that Macerich worked closely with Red Five to manage the content and the look and feel of its websites. Red Five provided and customized a content management tool, called Project Site Manager ("PSM"), which gave Macerich control over the content and design of its web pages. Adding functionality to this program required rewriting Java code for the PSM software, or the web pages that incorporate the content, but it did not require customizing the Apache and Tomcat software or changing how Apache and Tomcat processed requests for Macerich's web pages. [E]picRealm presented no evidence that Red Five customized the allegedly infringing combination of Apache and Tomcat for Macerich. And, Macerich demonstrated that after Red Five made the choice to implement the Apache and Tomcat software in 2003, Macerich's involvement in customizing the PSM tool had not affected how the allegedly infringing combination of Apache and Tomcat operate to process requests and serve web pages.

For these reasons, the Court found no genuine issues of material fact existed regarding whether Macerich performed any of the steps of the claimed methods, and concluded Macerich could not be liable for infringement of those claims under § 271(a) as a matter of law.

### 3. Analysis

Similar to the situation in *epicRealm,* wherein Red Five, and not Macerich, ran the accused software to manage incoming requests on its web servers, Herbalife asserts it did not make, own, operate, or control the accused instrumentality. However, epicRealm argues there is one critical difference between the evidence presented in *epicRealm* and the evidence involved here. This critical difference, according to epicRealm, is Herbalife's control over the database from which data is dynamically retrieved for the creation of dynamic web pages.

According to epicRealm, in the Macerich case, the content for Macerich's web pages was stored on Red Five's server as Java server page ("JSP") files. *epicRealm,* 492 F.Supp.2d at 623. When Macerich would request that Red Five make changes to the content management tool called Property Site Manager ("PSM"), Red Five would add functionality to the server and write new JSP code which interacted with the Tomcat software. *Id.* at 623–34. Red Five, at the request of Macerich, developed a centralized database regarding the retailers at Macerich's shopping centers. *Id.* at 624.

Here, unlike the situation in the Macerich case, Herbalife retained complete control over the data source ("the DNS server") from which QuinSteet received data and generated dynamic web pages. Specifically, Herbalife entered into a written contract with QuinStreet in February 2003 whereby it licensed the right to use the allegedly infringing system, called the QuinStreet "Platform," on which Herbalife proceeded to host certain of its websites. The contract required QuinStreet to integrate its Platform with Herbalife's internal data source, called the "Web Services Tier," for the purpose of enabling the Platform and the Web Services Tier to share

dynamic information about Herbalife's distributors and its products.

In addition to integrating its data source with the QuinStreet Platform, there is evidence that Herbalife controlled both the content that was displayed on its websites and the website URLs. By controlling the URLs, Herbalife could direct requests made to its websites either to or away from QuinStreet IP addresses. According to epicRealm, Herbalife controlled the "front door" to the Platform, the "data source" supplying dynamic web content to the QuinStreet Platform, and the actual content fed through the QuinStreet Platform.

For example, every fifteen minutes, QuinStreet would call Herbalife's database and request data summarizing the pricing and availability of products. (Taurek Dep. at pgs. 199–200). QuinStreet would also request distributor information at the beginning of a distributor session or after a time-out function or a log out by a distributor. (Harris Dep. at 79–81) (Adams Dep. at 35) (Taurek Dep. at 200–02) ("Some distributor information was provided each time a distributor would log in."). The "admin[.] users at Herbalife" provided data into the database which was used to generate dynamic pages. (Harris Dep. at 57–58). The Herbalife administrators also tell the DNS server which IP addresses to direct *www.herbalife.com* to. (Adams Dep. at 28–29). When someone types in *www.myherbalife.com* into a browser window, the DNS server directs the user to a particular IP address which was supplied by Herbalife. (Adams Dep. at 31).

The Court now considers whether the above evidence of Herbalife's control and configuration of the DNS server distinguishes this case from that in *epicRealm*. The Court first considers whether epicRealm has created a genuine issue of material fact for "use" direct infringement. The Court will then consider whether, as urged by epicRealm, there is a genuine issue of material fact for "joint" direct infringement.

### a. "Use" direct infringement

■■ An alleged infringer directly infringes on a patent if the infringer, without authority, "makes, uses, offers to sell or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent." 35 U.S.C. § 271(a). In the context of § 271(a), courts interpret the term "use" broadly to determine if behavior constitutes an infringing "use" of a patented invention. *See NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1316–17 (Fed.Cir.2005). The ordinary meaning of "use" is "to put into action or service." *Id.* (*citing Webster's Third New Dictionary* 2523 (1993)); *see also Renhcol Inc. v. Don Best Sports, et al.*, 2008 WL 1885522, *3 (E.D.Tex. Apr. 28, 2008). Not only is "use" required in the context of "use" direct infringement, but courts also require the alleged infringer to use the allegedly infringing aspects of the *accused system*. *Renhcol*, 2008 WL 1885522, *6 (emphasis added) (This Court's decision in *epicRealm*, in conjunction with the Federal Circuit's decision in *NTP*, "requires courts to determine which party exercises control and derives beneficial use of the allegedly infringing aspects of the accused system."). Here, the parties disagree over what constitutes the allegedly infringing aspects of the accused system.

In the *epicRealm* decision, Judge Folsom considered the alleged accused system. There, Judge Folsom stated the patents-in-suit claim a method and apparatus for managing dynamic web page generation requests and that in the context of the claimed invention, the allegedly infringing "use" of the accused software must be the operation of the software to manage dy-

namic web page requests. *epicRealm*, 492 F.Supp.2d at 614. The accused software in the *epicRealm* case was the combination of Apache and Tomcat software.

The accused software/hardware here is Apache and Weblogic. Now, epicRealm seeks to avoid the result reached by this Court in *epicRealm* by focusing on Herbalife's interactions with the QuinStreet Platform, by its integration of the DNS server into the Platform. Specifically, epicRealm argues there is a genuine issue of material fact that Herbalife puts "into action or service" the accused system Arguing further, epicRealm asserts the QuinStreet systems, as the accused systems, are put "into action or service" or not depending on how Herbalife configures the DNS server. According to epicRealm, Herbalife, through its ownership, operation, and control of the DNS server, (1) controls which requests are directed to the QuinStreet systems and (2) determines whether and what data are retrieved for the generation of dynamic web pages.

As support for its argument that Herbalife's control over the DNS server implicates several limitations in the asserted claims, epicRealm asserts the patent claims require generation of a web page "including data dynamically retrieved from one or more data sources." '554 Patent, Claim 1. [E]picRealm focuses on claim 9 of the '554 Patent, a system claim, which requires "one or more data sources" from which data is dynamically retrieved. According to epicRealm, whether the QuinStreet system receives a request for a web page containing dynamic content, or whether QuinStreet does not receive said request, depends on how Herbalife configures the DNS server as demonstrated by the evidence discussed above.

Herbalife asserts, however, the QuinStreet Platform is not a system that is an accused system, and Herbalife's involvement with the Platform is irrelevant.

Herbalife further contends the fact that QuinStreet could access data on the Herbalife system is insignificant. All of the patent claims include the element of dynamically retrieving data from a data source which, according to Herbalife, includes any conceivable data source located anywhere on the world wide web. Herbalife argues the patented element is the act of dynamic retrieval, not the data or the data source itself. Herbalife further argues:

> epicRealm's construct of a QuinStreet Platform as the accused platform in which Herbalife purportedly played a sufficiently central role to be deemed a 'user' of the system is a false construct unrelated to the Apache and Weblogic dynamic page managing system claimed in the patent. Moreover, the described entanglements have nothing whatsoever to do with selecting, operating, or controlling the accused system.

Herbalife's reply at pgs. 8–9.

The Court agrees with Herbalife that the QuinStreet Platform is not a system that is an accused system, and therefore the extent or nature of Herbalife's involvement with the QuinStreet Platform does not matter. Moreover, Herbalife's interactions with the QuinStreet Platform set forth above are unrelated to the Apache and Weblogic software/hardware architecture that is the accused system. Consequently, those activities do not indicate or support a conclusion of control of the accused system on the part of Herbalife.

Even though Plaintiff applies the Federal Circuit's decision in *NTP* to the present situation, as urged by Herbalife, *NTP*'s patented invention applied to the transmission of electronic mail originating in an electronic email system (fixed and wired), which was then transmitted by RF to and received by a user and stored on his or her mobile RF receiver where it can be

viewed. There, the claimed invention applied to the entire process of transmission of emails, from originating source to the handheld devices employed by Blackberry users. The patented claims *covered both receipt and sending of messages* because the sent message went through the desktop and then back out to another handheld. In this context, the Federal Circuit held that when "RIM's United States customers send and receive messages by manipulating the handheld devices," use by the customers occurred. *NTP,* 418 F.3d at 1317. "RIM's customers . . . controlled the transmissions of originated information and also benefitted from such exchange of information." *Id.*

In contrast, the epicRealm patents do not cover the transmission of dynamic web pages to a browser in response to a request. Rather, epicRealm's patents cover only part of that process, and only in terms of a method or system for managing requests. A website could employ different methods, which might or might not infringe the patents. Because the system at issue is more narrow, the "control" analysis is different. Here, the analysis must focus on control of the Apache and Weblogic software and hardware used to manage dynamic web page requests.

Importantly, the patents-in-suit are not about how or when data is accessed. Rather, as recognized by Judge Folsom in *epicRealm,* "[i]t is this method of managing and responding to requests, and not a method of sending a request and receiving a response, that is claimed by the patents in suit. . . . Thus, it is the method of managing requests which must be controlled if it is to be used . . . ." *epicRealm,* 492 F.Supp.2d at 615. On the other hand, the "claimed system in *NTP* was directed to a system for the transmission of messages . . . and that is exactly the function that the defendant's customers controlled." *Id.* at 614.

Here, the QuinStreet Platform and its integration with Herbalife's data source is not properly considered a method of managing and responding to requests, which is claimed by the patents-in-suit. Therefore, despite the evidence of Herbalife's control over the data source presented by Plaintiff in response to Herbalife's motion, the Court finds this case is analogous to that in *epicRealm.*

There Macerich also had the ability to control the data stored on Red Five's server through the use of the content management tool called Property Site Manager ("PSM"). Red Five allowed Macerich employees to log into the server and update the contact. Additionally, Red Five, at the request of Macerich, developed a centralized database regarding certain retailers. Here, Herbalife retained control over the data source from which QuinSteet received data and generated dynamic web pages, and the contract between QuinStreet and Herbalife required QuinStreet to integrate its Platform with Herbalife's internal data source for the purpose of enabling the Platform and the data source to share dynamic information about Herbalife's distributors and its products. The content was stored differently, but in both cases, Macerich and Herbalife provided the information and content.

Similar to the Macerich case, here there is no evidence that Herbalife can and did control the Apache or Weblogic software or hardware used to manage dynamic web page requests received by Herbalife websites hosted by QuinStreet. The words Apache and Weblogic do not appear in epicRealm's discussion of facts purporting to show that Herbalife "uses" the system accused in the '554 patent. It is thus uncontested that, as presented in Herbalife's Motion, QuinStreet alone selected, QuinStreet alone owned or licensed, and QuinStreet alone operated, managed and

controlled the Apache and Weblogic software and hardware used to manage dynamic web page requests received by the Herbalife sites hosted by QuinStreet. Therefore, epicRealm has raised no material fact which disputes or otherwise challenges Herbalife's evidence that it did not select and does not own, operate, or control the software or hardware used to manage dynamic web page requests on its hosted sites which is the only system that matters to this motion—the accused system for managing dynamic web page requests. Under *NTP* and *epicRealm*, the Court finds Herbalife is not a "user" of the accused Apache and Weblogic software, and Herbalife cannot be directly liable under this theory for the time period in question. The Court recommends Herbalife's motion for partial summary judgment as to epicRealm's claim of "use" direct infringement be granted.

**b. "Joint" direct infringement**

[E]picRealm contends that a genuine issue of material fact exists with respect to whether there is "joint" direct infringement. The relevant standard, as set forth in epicRealm's motion, is "the law imposes vicarious liability on a party for the acts of another in circumstances showing that the liable party controlled the conduct of the acting party." *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373 (Fed.Cir.2007). For all of the reasons discussed above, the Court finds Herbalife does not control the accused system, *i.e.*, the Apache and Weblogic architecture that manages dynamic requests.

Under the same patents and similar facts, this Court has considered this issue and concluded that control of the accused system was exercised solely by the third party web hosting company. The facts presented by epicRealm which purport to show enough activity to raise an issue of material fact as to Herbalife's control over "critical aspects of the QuinStreet Platform" do not create a genuine issue of material fact here. As noted above, those activities are not directed to the accused system, the Apache and Weblogic system used to manage dynamic web page requests. They are instead directed to the QuinStreet Platform, and in particular to aspects of it that are unrelated to the accused system. The fact that QuinStreet collected monthly fees, or integrated its Platform with Herbalife systems and provided a link between the two, or that QuinStreet and Herbalife worked together to maximize distributor retention is irrelevant to the proper analysis of control. Neither these circumstances, nor the fact that Herbalife controlled content on the web site and provided data used to respond to requests, makes Herbalife a joint infringer. None of these activities constitute control by Herbalife over how QuinStreet managed dynamic data requests.

In addition, the Apache and Weblogic software that was used to host Herbalife's sites was already in place and in use before the contract between QuinStreet and Herbalife was executed. Herbalife controlled no part of the relevant system, and epicRealm has failed to provide evidence that raises a genuine issue of material fact on the question of joint infringement. The Court recommends Herbalife's motion for partial summary judgment as to epicRealm's claim of "joint" direct infringement be granted.

**C. Indirect Infringement (Inducing Infringement)**

**1. 35 U.S.C. § 271(b)**

In addition to direct infringement, Plaintiff has also asserted against Herbalife a claim for indirect infringement (inducing infringement). Specifically, Plaintiff argues Herbalife's distributors are "users" of the QuinStreet Platform and are direct infringers and that Herbalife knowingly

induced and encouraged the distributors' direct infringement. Relying on this Court's *epicRealm* decision with respect to visitors to Macerich's web site, Herbalife asserts visitors to its websites were not engaging in any of the infringing acts that are claimed in the epicRealm patents.

■ Liability for inducing infringement is statutorily defined in 35 U.S.C. § 271(b). Section 271(b) provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). "In order to succeed on a claim of inducement, the patentee must show, first that there has been direct infringement, and second, that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1378 (Fed.Cir. 2005) (quotations omitted). "[M]ere knowledge alone of possible infringement by others does not amount to inducement; specific intent and action to induce infringement must be proven." *Warner–Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1364 (Fed.Cir.2003).

In order to establish a genuine issue of material fact on the first element of its claim of inducement, whether there has been direct infringement, epicRealm relies heavily on the Federal Circuit's decision in *NTP*. According to epicRealm, Herbalife's distributors are "users" of the QuinStreet Platform under *NTP* and hence direct infringers. Regarding the second element of its claim of inducement, epicRealm argues Herbalife induced its distributors to use the QuinStreet Platform.

## 2. *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282 (Fed.Cir.2005)

In *NTP*, the Court of Appeals for the Federal Circuit considered whether end-users of R.I.M.'s wireless network were "users" of the network under § 271(a).

Noting that "use" should be given a broad interpretation, the court held that R.I.M.'s "customers were users of a claimed system for transmitting messages because they controlled the transmission of messages within the system by manipulating a system component." *epicRealm*, 492 F.Supp.2d at 614 (*citing NTP*, 418 F.3d at 1317). Specifically, "the defendant's customers operated handheld Blackberry devices, and by 'manipulating' those devices, the system would transmit or deliver messages at the time chosen and as directed by [R.I.M.]'s customers." *Id.*

The *NTP* court held that R.I.M.'s customers were users of the allegedly infringing system even though they operated a single element of the system claimed in the patent-in-suit because "the components of a system are used collectively, not individually." *NTP*, 418 F.3d at 1318. Thus, unlike a process or method which "is not infringed unless all steps or stages of the claimed process are utilized," a system may be used, and therefore infringed, without the infringer directly using each element of the claimed system. *Id.*

Here, epicRealm asserts Herbalife's distributors are indistinguishable from the customers in *NTP*. Similar to the customers in *NTP* who used a system for transmitting messages by manipulating a system component (*i.e.*, the Blackberry device), Herbalife's distributors used the claimed system for sending dynamic web requests by manipulating a web browser on a computer system. More particularly, epicRealm argues that by manipulating a component of the infringing system (*i.e.*, the "client" or user's computer system), the web browser generated, and transmitted or delivered, web requests at the time chosen and as directed by Herbalife's distributors.

### 3. Analysis

The Court finds Herbalife's distributors distinguishable from the users in *NTP*. The system in question here relates to how a web site is operated, and not whether it is operated, and the reach of the patent is limited to a method for managing only a piece of the web site's processing and not to overall use. Therefore, the users in *NTP* are different from Herbalife's distributors.

In *epicRealm*, Judge Folsom recognized this distinction and held that users of the Macerich website were not users for purposes of § 271(a). The Court rejected epicRealm's argument that the website visitors "use" the allegedly infringing aspects of the web server when the visitors' web-clients submit uniform resource locator ("URL") requests to the web server. *Id.* at 615, 620. "Persons who send requests to a web server and receive a response do not control the operation of the Apache and Tomcat software.... Visitors are not allowed to control the manner in which the web site manages a request or generates a response. It is this method of managing and responding to requests, and not a method of sending a request and receiving a response, that is claimed by the patents in suit." *Id.* at 615.

According to Judge Folsom, the visitors' web-clients' URL requests provided an input to the software that allegedly infringed the claimed system. Specifically, a visitor's web-client made a request to a web server based on the URL the user enters. *Id.* at 620 (*citing* '554 Patent, col. 4:54–56). The web-client would direct this request to an appropriate web server. *epicRealm*, 492 F.Supp.2d at 620 (*citing* '554 Patent, col. 4:55–57). However, if the web-client requested dynamic content, the web server executable did not process the request. *epicRealm*, 492 F.Supp.2d at 620. Instead, an interceptor would intercept the request and direct the request via a dis-

patcher to a page server for processing. *Id.* (*citing* '554 Patent, col. 4:58–60). The page server then processed the dynamic content request and would thus release the web server and allow the web server to process other requests. *epicRealm*, 492 F.Supp.2d at 620 (*citing* '554 Patent, col. 5:12–20, col. 5:37–42).

Only the web server owner operated the allegedly infringing software that managed and responded to incoming requests. *epicRealm*, 492 F.Supp.2d at 615. The visitors could not control the manner in which the allegedly infringing web server managed the web-clients' URL requests or generated a response. *Id.* As the patent claimed a method of managing and responding to requests—"and not a method of sending a request and receiving a response"—only the web server owner exercised control of the method of managing requests. *Id.* Although the website visitors may indirectly benefit from the aspects of the web server that allegedly infringed the claimed invention, the Court found they are not "users" under § 271(a) because the web server owner, and not the visitors, exercised control over the aspects of the web server that allegedly infringed the claimed invention. *Id.*

[E]picRealm asserts its summary judgment evidence demonstrates that Herbalife induced its extensive network of distributors to use the accused system to access information and purchase Herbalife products. [E]picRealm relies on Herbalife's Agreement with QuinStreet which grants Herbalife *and its distributors* a right and license to use the QuinStreet Platform. However, the QuinStreet license refers to QuinStreet proprietary software, not the Apache/Weblogic system, and this Platform is not synonymous with Apache/Weblogic.

Similar to the Court's holding in *epicRealm*, there is no act of infringement

because visitors to Herbalife's websites are not "using" the Apache and Weblogic software within the meaning of § 271(a). "Visitors are not allowed to control the manner in which the web site manages a request or generates a response. It is the method of managing and responding to requests, and not a method of sending a request and receiving a response, that is claimed by the patents in suit." *epicRealm,* 492 F.Supp.2d at 615. Accordingly, Herbalife cannot be liable for inducing infringement by its web site visitors because those visitors are not, in fact, infringing users of the accused software. *See id.*

There is no genuine issue of material fact whether Herbalife is liable as an inducer. For the above reasons, the Court recommends the portion of Herbalife's motion for summary judgment regarding epicRealm's indirect infringement claims be granted. Based on the foregoing, it is

**RECOMMENDED** that Defendant Herbalife International of America's Motion for Partial Summary Judgment of Non–Infringement (Docket Entry # s 479, 437, 105) be **GRANTED.**

Within ten (10) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. 636(b)(1)(C).

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn,* 474 U.S. 140, 148, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Rodriguez v. Bowen,* 857 F.2d 275, 276–77 (5th Cir.1988).

**SIGNED** this 15th day of July, 2008.